BARRETT B. CLARK

*v.*

A. T. EWING *et al.*

1. CHANCERY—*relief against judgment.* In order to maintain a bill to set aside a judgment, to which there was a good defence at law known to the defendant at the time it was rendered, it must clearly appear that the enforcement of the judgment would be unjust and against conscience, and moreover, that the defendant was prevented from making his defence in the action by fraud, mistake. accident or surprise, without *laches*, negligence or default on his part or those representing him.

2. SAME—*effect of motion to dismiss.* A motion to dismiss a bill for want of equity is in effect a general demurrer to the bill, and amounts to an admission of the truth of all the facts therein stated.

3. SAME—*negligence of counsel is that of his client.* A client who employs counsel to defend a suit is responsible for his negligence or other acts which

do not amount to a fraud. The sickness of counsel, when the time to plead has been extended over a month, which is known to the client, so that he might have employed other attorneys, furnishes no equitable ground of relief against a judgment taken by default for want of pleas.

APPEAL from the Appellate Court of the First District.

On the 29th of November, 1872, Arnold & Sisson sold and delivered to Barrett B. Clark, appellant, a stock of goods for the sum of $4910.72, to be paid for in specified installments.

By the agreement Clark was to give Arnold & Sisson eight notes, for the sum of $500 each, and another for the sum of $910.72. It is conceded that all these notes, except one for $500, were executed and delivered in pursuance of the agreement, and it is claimed by appellees that they were all so executed and delivered; but appellant contends that one of the $500 notes, viz: the one first maturing under the agreement, was, in point of fact, never delivered at all, but was otherwise settled by Clark about the time of the purchase.

Some time prior to the first day of April, 1875, Arnold & Sisson became insolvent, and, upon proceedings being instituted for that purpose, they were adjudged bankrupts, and A. L. Ewing, one of the appellees, was appointed assignee of their estate.

On the day last mentioned Ewing, as assignee, commenced, in the Will county circuit court, three actions of assumpsit against appellant, in which, on the 19th of July following, he recovered judgments by default for the respective sums of $242.30, $1140.02 and $550, together with costs of suits. On appeal to this court these judgments were affirmed at the September term, 1877. See *Clark* v. *Ewing,* 87 Ill. 344.

On the affirmance of these judgments executions were sued out and placed in the hands of the sheriff, who levied them on the property of appellant, and was proceeding to sell when, on the 17th day of October, 1878, appellant filed a bill enjoining the sheriff and plaintiff from all further proceedings under said judgments.

On the 25th day of the same month the circuit court, on motion of appellees, dissolved the injunction and dismissed the bill for want of equity.

This decree, upon appeal to the Appellate Court of the First District, was affirmed, and appellant now brings the record to this court for review.

Messrs. BARBER, RANDALL & FULLER, for the appellant.

Messrs. STEVENSON & EWING, for the appellees.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

The object of the bill in this case was to set aside these judgments and obtain new trials at law. It sets out in detail the entire proceedings at law, including the evidence heard by the circuit court in assessing the damages, and upon the motions to set aside the defaults. The facts set forth in the bill and relied upon to show that it would be inequitable to enforce the collection of these judgments, are somewhat fuller and more conclusive than they appeared upon the hearing of the motions to set aside the defaults, though in most respects they are substantially the same.

Before a bill can be maintained to set aside a judgment to which there was a good defence at law, known to the defendant at the time it was rendered, it must clearly appear that the enforcement of the judgment would be unjust and against conscience, and moreover, that the defendant was prevented from making his defence to the action in which the judgment was obtained, by fraud, mistake, accident or surprise, without *laches,* negligence or default on his part or those representing him.

The general principle here stated has been formulated in such a variety of ways, and has been so often announced by this court, that no good could result from a review of the authorities on the subject. We shall, therefore, content ourselves with a reference to a few of the cases in which the

doctrine is laid down : *Buntain* v. *Blackburn*, 27 Ill. 406; *Sanger et al.* v. *Fincher, Admx.*, etc. id. 346; *How et al.* v. *Mortell*, 28 id. 478; *Bay et al.* v. *Cook*, 31 id. 336; *Vennum* v. *Davis et al.* 35 id. 568; *Kern* v. *Strausberger et al.* 71 id. 413; *Allen* v. *Smith et al.* 72 id. 331; *Weaver* v. *Poyer et al.* 70 id. 567; *Smith et al.* v. *Powell et al.* 50 id. 21; *Walker* v. *Shreve et al.* 87 id. 474. The motion to dismiss for want of equity is in effect a general demurrer to the bill. It is in law an admission of the truth of the facts therein stated, and for the purposes of this case we must concede to appellant all such rights as the law would confer on him by reason of the actual existence of the facts stated in the bill. *Weaver* v. *Poyer et al.* 70 Ill. 567.

Assuming, as we must, then, that the charges in the bill are true, it is quite manifest that appellant had a good and meritorious defence to each of the actions in which these judgments were obtained. So far from appellant being indebted to Arnold & Sisson, or their assignee, at the time the judgments were obtained, the bill clearly shows that they were indebted to him to the amount of several hundred dollars. It follows, therefore, that it would be inequitable and against conscience to enforce their payment. But this alone, as we have just seen, does not warrant a court of equity in interposing to prevent the consummation of such a wrong. By the rule above laid down, appellant must go a step further before he is entitled to such relief, and show that he was prevented from making his defence at law by some fraud, accident or mistake, without any *laches* or neglect on his part.

The record shows that the general rule to plead expired on the 9th day of June, 1875. On that day neither appellant nor his attorney, Judge Norton, was present, and no plea had been filed. Mr. House, a local attorney, on a message from Norton, applied for and obtained an extension of the rule to plead till the third Monday, being a period of two weeks, lacking one day. On the third Monday neither appellant nor his attorney was present, and no pleas had been filed; but

Norton had in the meantime written to House to make another application for an extension of the rule to plead, which he did, and the rule was again extended, giving appellant two weeks' additional time. In the letter of Judge Norton he assigns as a reason for not having filed the pleas, that he had been sick.

Just before the fifth Monday, the time to which the rule had been extended, Norton again writes to House asking him to make yet another application for a further extension of the rule to plead, giving no reason why he had not prepared pleas, but stating that "the pleas in said cases were peculiar and nobody could draw them but himself, and he could not explain by letter so that another could draw them." The rule to plead was again extended till the third Monday of July, being the 19th day of the month. House then wrote to Norton of the further extension, and telling him in the same letter that counsel for plaintiff in the suits assured him that he would resist any further application for an extension of the rule.

On the third Monday of July there were still no pleas in, nor was appellant or any one representing him present, and thereupon judgments were taken by default, as we have already seen.

It also appears from the affidavit of Lowe that "Norton had been ill and confined to his room for more than four months previous to his death, which occurred on the 3d of August, 1875. And it further appears from appellant's own statement, that after the rule to plead was extended the last time, he met with House, and was informed by him of the extension of the rule to the 19th and of Norton's promise to have the pleas in by that time—and also of the fact he had been sick.

It is thus seen that after the rule to plead had been extended from time to time, covering a period of about one month, appellant had express notice that up to that time no pleas had been filed. Was it not about time after this long, very long delay, that appellant was looking out for some one who could

and would give the cases some attention ? But for the courtesy of House these judgments might, and doubtless would have been rendered a month before they were. But, admitting appellant was not personally guilty of negligence or *laches* in defending these suits, can so much be said of his counsel?

It may be urged that the ill health of counsel prevented him from giving the cases the attention they required. The record fails to show that this cause had anything to do with the failure to comply with the rule of court until after the first extension had been obtained; nor does Judge Norton claim in his second letter to House, after the rule had been extended the second time, that ill health had prevented him from complying with the rule; but conceding that his health was bad all the time, it is very clear that he was able to correspond with House up to within a few days before the defaults were entered; and if he was too ill to attend to the business himself, can it be doubted for a moment, after this extraordinary delay, that it was his duty to notify his client of the condition of his health, so that he could make other arrangements?

We look in vain through the record before us for even an attempt on the part of appellant to excuse the failure of counsel to file pleas, in compliance with the general rule of court, before any extension of the rule was asked. Parties litigant and their counsel must be presumed to know the rules of court, and it is their duty to comply with them, and if they do not, they must take consequences. Such rules are instituted for the general good, and it is the duty of courts to enforce them,—otherwise it would be useless to adopt them.

If the general health of an attorney breaks down, he should notify his clients of the fact, so that they can take such steps as may be necessary for their protection. Appellant seems to be proceeding on the theory that he is not at all responsible for the negligence of his counsel. The very reverse of this is the law.

37—93 ILL.

In *Yates* v. *Monroe et al.* 13 Ill. 219, where appellant sought to excuse himself for permitting a judgment to go against him on the ground that his attorney had been guilty of negligence, it was said: "The negligence of the counsel whom he had employed to attend to the cause is the same as his own negligence, and he must suffer the consequences of it."

In *Albro, impleaded, etc.* v. *Dayton,* 28 Ill. 325, the same doctrine is laid down. To the same effect is *Smith et al.* v. *Powell et al.* 50 id. 21.

In *Winchester* v. *Grosvenor,* 48 Ill. 517, which was a case like the one before us, in answering a claim made by complainant to the effect that she had been mislead by her attorney, and that he had abandoned her case, we said: "The mere fact that her attorney gave her advice which turned out to be opposed to the judgment of the court, or the fact that her attorney abandoned the case before trial, does not constitute accident or mistake of the character upon which a court of equity acts." So, in the late case of *Kern* v. *Strausberger,* 71 Ill. 413, in discussing the same subject, we said: "The general doctrine is, the negligence of the attorney is the negligence of the party himself, and we are inclined to the opinion, in the absence of special circumstances making it equitable for the client to have relief, it is the better rule." Of course, where the special circumstances in a given case amount to a fraud on the client, and the judgment is thereby obtained, that would doubtless change the rule. But there is no pretence for any claim of that kind here.

It follows, from what we have said, that the circuit court committed no error in dismissing complainant's bill, and therefore the judgment of the Appellate Court must be affirmed.

*Judgment affirmed.*